# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| ERIKA BEADLE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | No. 07-2719-STA-tmp |
| | ) | |
| MEMPHIS CITY SCHOOLS, | ) | |
| NEW LEADERS, INC., d/b/a NEW LEADERS | ) | |
| FOR NEW SCHOOLS, | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## ORDER GRANTING DEFENDANT NEW LEADERS, INC.'S MOTION TO DISMISS
_____

Before the Court is Defendant New Leaders, Inc.'s Motion to Dismiss (D.E. # 32) filed

on March 31, 2008. For the reasons set forth below, the Motion is **GRANTED**.

## BACKGROUND

Plaintiff was a 2006 participant in the Defendant New Leaders for New Schools'

("NLNS") fellowship program. Def.'s Mot. Dismiss 1. NLNS is a national, not-for-profit

organization that sponsors a program to identify and train prospective administrators for urban

public schools around the country. *Id*. NLNS does not employ its fellows but works alongside

local school districts like Defendant Memphis City Schools ("MCS"). *Id*. Plaintiff was,

however, already an MCS employee when she was selected as a NLNS fellow. *Id*. at 2. NLNS

and MCS contracted to "identify, train, certify, and place outstanding principals and assistant

principals for public schools in Memphis." Pl.'s Resp. to Def.'s Mot. Dismiss 1. The agreement

between NLNS and MCS called for NLNS to recruit ten to fifteen fellows per year to participate

1

in an eighteen-month training program. *Id*. at 2. The training program included summer

foundation courses conducted by NLNS and then a one-year residency where the fellow worked

as an assistant principal in MCS and reported to a Resident Principal selected by NLNS and

MCS. *Id*. Fellows also worked with a Leadership Coach provided by NLNS who was an

"experienced former principal or school leadership coach with a successful track record." *Id*.

Fellows met with their Resident Principal and Leadership Coach weekly to discuss their

experiences in their schools. *Id*. During their residency, fellows were paid and employed by

MCS.[1]

At the completion of the residency, NLNS pledged to assist fellows in obtaining a

principal position with MCS. Plaintiff's Agreement with NLNS specifically stated, "*While New

Leaders for New Schools actively supports all Residents in the job seeking process, New Leaders

for New Schools does not guarantee placement as a school leader (principal or assistant

principal).*" (italics in original).[2] Per the same Agreement, NLNS undertook to "[r]esearch

available placements and ensure that New Leaders are considered for appropriate school

leadership positions within the Memphis City Schools. *New Leaders for New Schools does not

guarantee placement after the Residency as a school leader for any New Leader

Resident.*"(italics in original).[3] Additionally, the contract between NLNS and MCS called for

MCS to "commit to including all New Leaders that successfully complete the Residency in open

interview processes for Principal and Assistant Principal positions throughout Memphis City

---

[1] Kadetsky Mot. Dismiss Aff., Ex. A, ¶ 3.1.

[2] *Id*. at ¶ 1.1.4.

[3] *Id*. at ¶ 2.9.

Schools."[4]

However, not all fellows were guaranteed placement with MCS under the Agreement.[5] NLNS and MCS entered into a Memorandum of Understanding ("MOU") detailing the responsibilities of each organization in the implementation and administration of the program, particularly the hiring of fellows who successfully completed the residency portion. Following residency, MCS committed to giving fellows "priority status" for interviews and hiring, that is, fellows with positive ratings from NLNS and the MCS Superintendent were guaranteed an interview for principal positions.[6] MCS undertook to hire successful residents as principals, and for those not hired as principals, either to hire them as assistant principals or "make every attempt to place" them in vacant administrative MCS positions.[7] For its part, NLNS would "help identify open positions for participants in MCS" and "help prepare New Leaders Fellows for the application, interview, and selection process."[8] Ultimately, the MOU provided the following:

> Nothing in this agreement replaces the MCS Superintendent's statutory authority or undermines the MCS Superintendent's ability to dismiss principals and assistant principals (including Resident Principals) at will. Nothing in this agreement undermines

---

[4] *Id*. at ¶¶ 3, 3.1.

[5] *Id*. at ¶ 3.4 (MCS would "[a]gree to waive any future commitment after the [one-year] Residency year for any New Leader that is not offered a Principal or Assistant Principal or equivalent role in a school within the Memphis City Schools by August 1, 2007"). Fellows accepting employment with MCS pledged to remain in their positions for three years beyond the residency if hired as a principal or for two years beyond the residency if hired as an assistant principal. Fellows were subject to monetary penalties should they not fulfill their commitment to serve in the MCS.

[6] Kadetsky Mot. Dismiss Aff., Ex. B at ¶ VII.

[7] *Id*. at ¶ VII, B., (6).

[8] *Id*. at ¶ VII, A., (1) and (2).

New Leaders' ability to dismiss Resident Principals at will.[9]

As for dismissal and other corrective actions, Plaintiff's Agreement with NLNS granted
NLNS wide discretion over the retention of NLNS Fellows: "If a New Leader is not performing
satisfactorily, it is under the sole discretion of the Organization [i.e. NLNS] to dismiss the New
Leader from the program at any point in time."[10]  As for situations not covered in the Agreement,
NLNS "reserve[d] the right to dismiss a New Leader from the Program at any time and for any
reason."[11]  Upon dismissal, NLNS would communicate the dismissal to MCS.[12]

Plaintiff began her training as an NLNS fellow in June 2006 prior to the start of the 2006-
2007 school year.  That month Plaintiff attended a training event in Philadelphia, Pennsylvania.
As part of the training event, Plaintiff and other fellows participated in small group discussions
where the topic turned to the problems confronting urban schools.  According to Plaintiff, during
the discussion Plaintiff disagreed with another participant's statement that "all white people are
privileged."  Two days after the discussion, Plaintiff was confronted by Rita Porter, an employee
of NLNS and Plaintiff's Leadership Coach, and Bill Kearney, the executive director of NLNS's
Memphis office.   Both Porter and Kearney are African-American; Plaintiff is white.  Plaintiff
alleges that Porter and Kearney questioned her about her disagreement with the statement that
"all white people are privileged."  Plaintiff further alleges that Kearney told her that she
"disgusted him," instructed her to leave the training event, and informed her that she would be

_____

[9] *Id.*

[10] Kadetsky Mot. Dismiss Aff., Ex. A, ¶¶ 6, 6.1.

[11] *Id.* at ¶ 6.1.

[12] *Id.*

dismissed from the NLNS program immediately.  According to Plaintiff, Kearney reconsidered after other NLNS colleagues showed support for Plaintiff.  Kearney telephoned Plaintiff, apologized for yelling, and gave Plaintiff another chance in the program.  Nevertheless, Plaintiff alleges that Porter marked her as "below proficient" in cultural competence and expressed to Plaintiff her disbelief  "how someone who appeared to be as intelligent as [plaintiff] was could not recognize the fact that all white people are privileged."  Compl. ¶ 22.

Plaintiff began her one-year residency at the start of the 2006-2007 school year.  In October 2006, Plaintiff made a complaint of racial harassment against Porter because of Porter's critical comments about Plaintiff's performance.[13]  Plaintiff contended that Porter was retaliating against her for the dispute that had occurred during the training event in Philadelphia in June 2006 and because of her race.  Plaintiff requested that NLNS assign her a new Leadership Coach.  In response to Plaintiff's complaint, Kearney later told Plaintiff that he believed that there had only been a mis-communication between Plaintiff and Porter.  Kearney denied Plaintiff's request for a new Leadership Coach.

According to Plaintiff, NLNS also engaged in retaliatory conduct to oppose her promotion to principal.  In January 2007, Porter and Dianne Turner-Wilson, the NLNS Memphis Leadership Coach Supervisor and Porter's immediate supervisor, reported to Kearney and MCS that Plaintiff was not being recommended for a principal position by her supervising principal, Pete Johnson.  Plaintiff claims that Johnson did in fact support her for principal and Porter and Turner-Wilson's misrepresentations to the contrary were further retaliation against Plaintiff.

---

[13] Plaintiff's Complaint in this case (¶ 23) indicates that a copy of her letter about Porter was being attached as Exhibit B to her Complaint.  It appears to the Court that Plaintiff did file an Exhibit A but no Exhibit B.

Plaintiff also alleges that Porter and Turner-Wilson misled Johnson into believing that he did not

need to write Plaintiff a formal letter of recommendation for promotion to principal.[14]  As a

result, Johnson did not write the letter by the appropriate deadline.  Plaintiff claims that Porter

treated her differently than other NLNS fellows by visiting their principals and hand-delivering

letters of recommendation on their behalf to MCS.  Finally, Plaintiff states that Kearney told her

that NLNS would not support her promotion to principal or even the recommendation of her

supervising principal.

At the end of her residency, Plaintiff was dismissed from the NLNS program for failure

to meet its standards.  Additionally, MCS decided not to promote Plaintiff to school principal,

yet Plaintiff continued to be and remains employed by MCS as an assistant principal.[15]

Plaintiff has made the following allegations against NLNS: (1) retaliation pursuant to the

Tennessee Human Rights Act ("THRA"); (2) tortious interference with contract pursuant to state

law; and (3) aiding and abetting MCS in retaliation against Plaintiff in violation of the THRA.

While Defendant NLNS has not answered Plaintiff's Complaint, NLNS has filed the

instant Motion to Dismiss all claims against it pursuant to Federal Rule of Civil Procedure

12(b)(6).[16]  First, NLNS argues that Plaintiff has failed to state a claim against NLNS for

---

[14] In February 2007, Plaintiff filed an EEOC charge concerning Porter's and Turner-Wilson's alleged misrepresentation and failure to inform her supervising principal of the deadline for letters of recommendation.  In August 2007, the EEOC issued Plaintiff a Right to Sue Notice.

[15] The parties have stated that Plaintiff has settled her claims with MCS, and the parties are awaiting final approval of the settlement from MCS's office of general counsel.

[16] By its Order of February 11, 2008 (D.E. # 25), the Court granted NLNS an extension of ten (10) days after the disposition of the Motion before the Court in which to file its Answer, if necessary.

retaliation because she was never employed by NLNS. NLNS contends that the protections of

the THRA against retaliation found at Tenn. Code Ann. § 4-21-401 apply only to an employer-

employee relationship. According to NLNS, Plaintiff was at all times during her participation in

the NLNS program an employee of MCS, not NLNS. In addition to the lack of an employment

relationship, NLNS contends that Plaintiff never participated in a protected proceeding available

under the THRA, an essential element of a THRA retaliation claim. Instead Plaintiff can only

show that she made a written complaint to Kearney. Even assuming that Plaintiff could show

that she engaged in protected activity, NLNS claims that she has failed to allege any evidence,

direct or circumstantial, that NLNS took adverse action against her because of her protected

activity. Several months elapsed between her complaint to NLNS and the alleged

misrepresentations by NLNS employees, and so Plaintiff must produce additional evidence to

establish causality. Finally, Plaintiff's retaliation claims should be dismissed because MCS

made the decision not to promote Plaintiff, not NLNS.

Second, NLNS asks the Court to dismiss the aiding and abetting claim because Plaintiff

must show that NLNS had knowledge of an alleged violation of the THRA by MCS and

encouraged the conduct. Not only does Plaintiff fail to make such an allegation, but NLNS

insists that this count must also be dismissed should the Court find that Plaintiff's underlying

claim of retaliation against MCS is insufficient.

Finally, NLNS argues that Plaintiff's tortious interference with contract claim is

insufficient because there was no contract between Plaintiff and MCS for a position as principal.

At most, Plaintiff's allegation could be construed as a claim for intentional interference with a

potential business relationship. Even so NLNS contends that Plaintiff has not pled one of the

7

required elements of that cause of action, namely, causation. NLNS had no ability to promote and cause MCS to promote Plaintiff to principal.

Plaintiff has responded in opposition to the Motion to Dismiss. First, Plaintiff argues that the claim for retaliation under the THRA is sufficient because NLNS was in effect the agent of the MCS. In other words, any decision of NLNS was as good as the decision of MCS. MCS had a contract with NLNS whereby NLNS assumed a significant role in recruiting and training prospective principals for MCS. According to Plaintiff then, "In so doing, NLNS was acting as an agent of MCS for purposes of the THRA." Any discriminatory conduct of NLNS is attributable then to MCS itself. As for the causal connection between Plaintiff's complaint and NLNS's alleged retaliation, Plaintiff states that to survive a motion to dismiss she need only establish "that the protected activity and the adverse action were not wholly unrelated." Further, Plaintiff contends that if her allegations are proven, there are sufficient facts to establish a causal connection between her complaint to NLNS and the retaliatory conduct of Porter and others.

Plaintiff also argues that she has sufficiently stated a claim for aiding and abetting. Contrary to NLNS's argument, Plaintiff need not show that NLNS had knowledge of MCS alleged retaliation. This is because NLNS itself had impermissibly retaliated against Plaintiff and as the agent of MCS, NLNS actions are attributable to MCS. Further, MCS relied upon the misrepresentations and recommendations of NLNS in deciding not to promote Plaintiff.

Plaintiff contends that her tortious interference with a contract claim is properly pled. At the same time, Plaintiff concedes that there was no contract between herself and MCS; therefore, the claim is better stated as one for intentional interference with a potential business relationship. Plaintiff argues that she has sufficiently pled all of the elements of this cause of action and

requests that the Court grant her leave to amend her Complaint.

## STANDARD OF REVIEW

"If the court determines at any time that it lacks subject-matter jurisdiction, the court

must dismiss the action."[17]  "The district courts shall have original jurisdiction of all civil actions

arising under the Constitution, laws, or treaties of the United States."[18]  Furthermore, the federal

district courts are granted diversity jurisdiction "where the matter in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs and is between citizens of different

states."[19]  In order for a federal court to exercise diversity jurisdiction, there must be complete

diversity among the parties, that is, no two parties to the action may be residents of the same

state.[20]

## ANALYSIS

The Court finds that it lacks subject-matter jurisdiction in this case due to the lack of

complete diversity among the parties.  Here, Plaintiff is a citizen of the state of Tennessee.

Defendant MCS is a special school district created by the state of Tennessee and has as its

"principal place of business" Memphis, Tennessee.  Defendant NLNS is a Massachusetts

corporation with its principal place of business in New York.  Because both Plaintiff and

---

[17] Fed. R. Civ. P. 12(h)(3).

[18] 28 U.S.C.A. § 1331.

[19] 28 U.S.C.A. § 1332.

[20] *Safeco Ins. Co. of America v. City of White House*, 36 F.3d 540, 545 (6th Cir. 1994) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)).

Defendant MCS are citizens of the state of Tennessee, there is no complete diversity in this matter. Therefore, the Court does not have diversity jurisdiction to hear Plaintiff's state law claims against NLNS.

Before the Court can dismiss Plaintiff's state law claims against NLNS for lack of diversity, the Court must consider whether it has supplemental jurisdiction over the claims. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."[21] In this case the Court does have original jurisdiction pursuant to 28 U.S.C.A. § 1331 over Plaintiff's federal law claim against Defendant MCS. Plaintiff's claim against MCS is brought under 42 U.S.C. § 2000e-5(f)(3), Title VII, a federal law protecting employees from unlawful discrimination. Therefore, the Court is authorized to exercise supplemental jurisdiction over Plaintiff's state claims against Defendant NLNS.

The Court finds, however, that the exercise of its supplemental jurisdiction is inappropriate under the circumstances. The statute that codified the federal courts' authority to exercise supplemental jurisdiction also grants the federal courts the discretion to decline to exercise its supplemental jurisdiction where a supplemental "claim raises a novel or complex issue of state law" or the supplemental "claim substantially predominates over the claim or claims over which the district court has original jurisdiction."[22]

---

[21] 28 U.S.C.A. § 1367(a).

[22] 28 U.S.C.A. § 1367(c)(1) & (2).

First, it is clear that Plaintiff's state law claims against NLNS predominate over her

single federal claim against MCS. While the Court does not reach the merits of Plaintiff's

claims, a brief review of the causes of action alleged in her Complaint is necessary. Plaintiff has

alleged that NLNS retaliated against her in violation of the THRA, tortiously interfered with her

contract with MCS in violation of Tennessee common law, and aided and abetted MCS in

retaliating against her in violation of the THRA. As for MCS, Plaintiff has alleged that MCS

retaliated against her in violation of Title VII. Based on the facts presented in the Complaint, the

acts and omissions which form the basis of Plaintiff's claims appear to be entirely attributable

not to MCS but to NLNS and its employees, Rita Porter, Dianne Turner-Wilson, and Bill

Kearney. Plaintiff alleges that she was the victim of discrimination on the basis of her race at the

hands of NLNS and its employees, not MCS. Plaintiff claims that her internal complaint to

NLNS concerned alleged racial discrimination on the part of NLNS, not MCS. Furthermore, its

was this complaint to NLNS that constituted the protected activity for which NLNS (and MCS)

retaliated against her. As for the retaliatory conduct, Plaintiff contends that the NLNS

employees, Porter, Turner-Wilson, and Kearney, all made efforts in bad faith to ensure that

Plaintiff would not receive promotion to principal with MCS.[23] Conspicuously absent from her

Complaint are any allegations about the specific retaliatory conduct of any MCS employee. It is

true that Plaintiff's Response to the Motion before the Court argues that NLNS was the agent of

MCS, and therefore NLNS's acts were all attributable to MCS. However, this argument itself

---

[23] Plaintiff never alleges the facts to support her claim that MCS retaliated against her; whereas, the Complaint details a series of acts which Plaintiff claims constituted retaliatory conduct on behalf of NLNS.

raises a question of Tennessee agency and contract law, not federal law.[24] Clearly then

Plaintiff's allegations about NLNS's conduct and her state-law claims for retaliation and tortious

interference against NLNS predominate over her single claim against MCS.

The only state-law claim against NLNS which is arguably "so related" to the Title VII

claim against MCS that it might "form part of the same case or controversy" is Plaintiff's aiding

and abetting claim. Plaintiff claims that NLNS aided and abetted MCS in retaliating against her.

However, as a cause of action, aiding and abetting the retaliatory conduct of an employer is

available under Tennessee law, not Title VII.[25] Tennessee applies its state common law theory

of aiding and abetting in the employment discrimination context.[26] Accordingly, a plaintiff must

show that "the defendant knew that his companion's conduct constituted a breach of duty, and

that he gave substantial assistance or encouragement to them in their acts."[27] Plaintiff's claim is

related to her Title VII claim in so far as she must prove that NLNS knew that MCS's retaliation

against Plaintiff constituted a violation of Title VII and that NLNS gave substantial assistance to

MCS in its retaliatory conduct. Nevertheless, Plaintiff's aiding and abetting claim is a state-law

claim. The allegation is made under Tennessee law, is only available under Tennessee law, and

is defined with reference to and requires the application of Tennessee common law. Therefore,

---

[24] Once again, because the Court is only considering whether the state-law claims
asserted in the Complaint predominate over the federal claims, the Court declines to examine the
merits of Plaintiff's agency arguments.

[25] *Carr v. United Parcel Service et al.*, 955 S.W.2d 832, 835-36 (Tenn. 1997)
(interpreting Tenn. Code Ann. 4-21-301(2) as defining individual cause of action for aiding and
abetting a discriminatory practice).

[26] *Id*. at 836.

[27] *Id*. at 836.

despite its relationship to the federal claim, the Court finds that this claim like Plaintiff's other

claims involves state law.  Taken together, Plaintiff's claims against NLNS are entirely

concerned with Tennessee law and predominate over her single federal claim against MCS.

A second factor further supports the Court's decision to decline to exercise its

supplemental jurisdiction over Plaintiff's state law claims against NLNS.  Without examining the

sufficiency of Plaintiff's Complaint, it appears to the Court that Plaintiff's causes of action raise

novel and complex issues of Tennessee law.  Chief among those issues is whether a non-profit

corporation like NLNS could be liable for retaliation under the THRA.  Although it is clear that

NLNS was never Plaintiff's employer, the THRA is broader than Title VII in terms of who may

be held liable for retaliation, particularly with regard to individuals who are not employers.[28]

Tenn. Code Ann. 4-21-301 defines retaliation and makes it

> a discriminatory practice for a person or for two (2) or more persons to: (1) retaliate or
> discriminate in any manner against a person because such a person has opposed a practice
> declared discriminatory by this chapter or because such a person has made a charge, filed
> a complaint, testified, assisted or participated in any manner in any investigation, proceeding
> or hearing under this chapter.[29]

For purposes of the THRA, a "person" includes one (1) or more individuals, governments,

governmental agencies,... or corporations.[30]  Taking the statute on its face, an entity such as NLNS

is a person under the THRA and could be liable for retaliation.  However, Tennessee courts have

not firmly resolved this issue.

---

[28] *Carr v. United Parcel Service et al.*, 955 S.W.2d 832, 835-36 (Tenn. 1997)
(interpreting T.C.A. 4-21-301(2) as defining individual cause of action for aiding and abetting a
discriminatory practice).

[29] Tenn. Code Ann. § 4-21-301(1)

[30] Tenn. Code Ann. § 4-21-102(14).

The scope of non-employer liability under section 4-21-301(1) is unsettled under Tennessee law. In *Kilgore v. Garner*, the Tennessee Court of Appeals dismissed a claim of retaliatory discharge because the defendants were not plaintiff's employers.[31] However, in the subsequent case of *Emerson v. Oak Ridge Research, Inc.*, the Tennessee Court of Appeals called the *Kilgore* holding into doubt and found that "individual liability can attach under the statute for retaliation... pursuant to the plain language of Tenn. Code Ann. §§ 4-21-102 and 301."[32] The *Emerson* court concluded that a business employing less than eight (8) people while not an "employer" as defined in the THRA could still be liable for retaliation as a "person" under the THRA.[33] The Tennessee courts have also permitted claims of retaliation against a supervisor who had allegedly engaged in sexual harassment.[34] The Tennessee courts, however, have never considered the applicability of the THRA's retaliation provision to a defendant like NLNS. Defendant NLNS is a non-profit organization that trains school leaders and contracts with local school districts to employ their fellows as residents and to consider residents for future leadership positions within the schools. It is unclear to the Court that Tennessee law would

---

[31] *Kilgore v. Garner et al.*, 1996 WL 469693 (Tenn. Ct. App. 1996) ("in the absence of a finding that [defendants] were employers of plaintiff, this conduct towards her, within the purview of the act, is not a discriminatory practice").

[32] *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 377 n. 4 (Tenn.Ct.App.,2005) ("The opinion of this Court in *Kilgore v. Garner* [citation omitted] is not applicable to this case because it was decided prior to the [Tennessee] Supreme Court's opinion in *Carr,* and thus fails to recognize that individual liability can attach under the statute for retaliation and or aiding and abetting, pursuant to the plain language of Tenn. Code Ann. §§ 4-21-102 and 301").

[33] *Id*.

[34] *Allen v. McPhee*, 240 S.W.3d 803, 824 (Tenn. 2007). While the *Allen* court did not explicitly recognize a cause of action for retaliation against an individual supervisor pursuant to T.C.A. 4-21-301(1), the court analyzed a retaliation claim against a university president separately and in addition to a retaliation claim against the university itself ).

classify NLNS in the same way it classified a small employer with less than 8 employees or a supervisor as a "person" for purposes of the THRA. Indeed this Court is hard-pressed to analogize to a fact-pattern like the one in the case at bar.[35] Therefore, in light of the lack of clear guidance from the Tennessee courts, this Court finds that it should decline to consider Plaintiff's supplemental claims because they involve novel and complex questions of state law.

<u>CONCLUSION</u>

The Court finds that it lacks subject matter jurisdiction to consider Plaintiff's state law claims against Defendant NLNS. Plaintiff's claims under Tennessee law against NLNS predominate over Plaintiff's single federal claim against MCS. Moreover, Plaintiff's retaliation claim against NLNS raises novel and complex issues of Tennessee law. Therefore, Defendant's Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED**.

> **s/ S. Thomas Anderson**
> S. THOMAS ANDERSON
> UNITED STATES DISTRICT JUDGE
>
> Date: November 18th, 2008.

---

[35] The Court notes that the anti-discrimination protections of the THRA also extend to employment agencies, Tenn. Code Ann. § 4-21-403, which the Act defines as "any person or agency, public or private, regularly undertaking, with or without compensation, to procure employees for an employer or to procure for employees opportunities to work for an employer." Plaintiff has not alleged that NLNS acted as an employment agency, yet NLNS arguably meets the THRA's definition. Even so, the Court has not identified a single Tennessee case applying this statute.